O

# United States District Court
# Central District of California

CAROL LEMUS HERRERA et al.,

Plaintiffs,

v.

CITY OF AZUSA et al.,

Defendants.

Case № 5:19-cv-02209-ODW (SPx)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [122]**

## I. INTRODUCTION

Plaintiffs Carol Lemus Herrera and Freddy Molina Sanchez bring this civil rights action against Defendants City of Azusa (the "City"), Officer Jared Bird ("Bird"), Lieutenant Robert Chivas ("Chivas"), and Chief Rocky Wenrick ("Wenrick") following a shooting involving Azusa Police Department ("AZPD") officers that resulted in Jose Javier Lemus's death inside his machine shop. (Compl., Dkt. No. 1.) Defendants now move for summary judgment on all of Plaintiffs' causes of action as asserted in the Second Amended Complaint. (Mot. Summ. J. ("Motion" or "Mot."), Dkt. No. 122.) For the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion.[1]

[1] Having carefully considered the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

## II. BACKGROUND

As it must on a motion for summary judgment, the Court sets forth the material facts, some of which are disputed, and views all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).[2]

### A. The Initial Contact

At midnight on December 21, 2018, Lemus was inside his machine shop located in an industrial warehouse in Azusa, California. (SUF 1–2.) Around 12:41 a.m., Lemus called 911 to report that someone was trying to break in. (SUF 4; AMF 1.) AZPD officers Bird, Jorge Arias, and Matthew Decaro were dispatched to Lemus's shop. (SUF 6–7.) Supporting officer Jerry Jarrett arrived shortly thereafter. (SUF 8.)

When the officers arrived, they observed two bullet holes in the shop window. (SUF 9.) Dispatch called Lemus and told him to step outside to meet with the officers. (SUF 10.) Lemus came outside and submitted to a pat-down. (SUF 11–12.) The officers noticed what was later revealed to be an empty gun holster at Lemus's side. (SUF 13.) The officers then followed Lemus into the shop and observed that he looked tired, had red eyes, and spoke in a slurred manner. (SUF 14–15.) The officers believed that Lemus was intoxicated based on his appearance and demeanor. (SUF 16.)

Once inside the shop, the officers asked Lemus what happened and he reported that he fired two warning shots from inside the shop at the supposed burglar. (SUF 19; AMF 1.) The officers saw that Lemus had two guns on the desk in the shop. (SUF 20.) To safely conduct their investigation, the officers removed the two guns from the office. (SUF 21; AMF 2.) Lemus protested to the officers removing the guns. (SUF 22.) He also questioned why the officers were asking him questions. (SUF 23.)

---

[2] The Court derives the factual background from Defendants' Statement of Uncontroverted Facts ("SUF"), (SUF, Dkt. No. 122-4), Plaintiffs' Statement of Genuine Disputes ("SGD") and Additional Material Facts ("AMF"), (SGD & AMF, Dkt. No. 127-1), and Defendants' Responses thereto, (Resp. AMF, Dkt. No. 130-2), in addition to the parties' clearly and specifically cited evidence, *see* C.D. Cal. L.R. 56-1 to 56-4.

The officers then suggested they review the surveillance footage to understand what happened. (SUF 25.) Lemus stated he did not have the code to access the footage. (SUF 26.) At one point in the investigation, Lemus mentioned that someone was in the bedroom of the shop. (SUF 27.) The officers then told Lemus that they had to perform a protective sweep. (SUF 28.) Lemus protested, telling the officers that they needed a court order to conduct the sweep. (SUF 29.)

**B. The Protective Sweep**

The officers and Lemus then went through the office, hallway, and back bedroom but did not find anyone else inside. (SUF 30.) In the hallway, the officers saw a file cabinet, safe, and door to the back workshop. (SUF 32.) Arias also observed a loaded shotgun in the hallway, partly obscured by clothing. (SUF 33; AMF 3.) Arias alerted Bird and Jarrett to the shotgun and its location. (SUF 34–35; AMF 4.) The officers did not secure the shotgun at that time and returned to the office area with Lemus. (AMF 5.) Eventually, all officers except Bird and Arias exited the shop. (SUF 36; AMF 7.)

**C. The Shooting**

When asked again about the surveillance footage, Lemus said that the password might be written down and walked toward the hallway. (SUF 37–40.) Bird and Arias followed Lemus into the hallway where they had first noticed the shotgun during the sweep. (SUF 40; AMF 5.) Arias observed Lemus begin to push buttons on the safe to the right of cabinets in the hallway. (SUF 41.) Lemus then quickly moved toward the shotgun and Arias followed. (AMF 8.) Lemus grabbed the shotgun, with the barrel initially pointed upward. (AMF 9.) A struggle immediately ensued between Arias and Lemus. (AMF 9.) During the struggle, both Arias and Lemus ended up crouched down. (SUF 49.) At some point during the struggle, the shotgun was pointed toward the shop bedroom, but not toward Bird or Arias. (AMF 10.) Bird unholstered his gun and held it out with his arms extended. (SUF 50.) Arias told Bird to shoot while Arias and Lemus were still struggling for the shotgun. (AMF 12.)

Arias eventually gained control of the shotgun. (SUF 51; AMF 11.) He held the shotgun against his chest with both hands. (AMF 14.) Bird could not see the shotgun after Arias and Lemus struggled over it. (AMF 15, 17.) Bird then saw Lemus run through the door to the workshop right next to him and start to close it. (SUF 52.) Bird could see Lemus's left hand on the door or doorknob as Lemus closed it. (AMF 18.) He did not see the shotgun in Lemus's hand but assumed it was in his right hand. (AMF 16.) Bird immediately fired four shots at the closed door. (SUF 54; AMF 19–20.) He gave no warning before he fired through the door. (AMF 21.) Bird heard no sounds from Lemus and was not aware whether he struck Lemus. (SUF 56.) As Bird fired, Arias was in a crouched position with the shotgun against his chest. (AMF 23.)

**D. The Aftermath**

Arias then exited the hallway carrying the shotgun. (AMF 24.) Bird followed. (SUF 58.) Wenrick, then an AZPD sergeant, later arrived at the scene. (SUF 64–65.) Officers informed Wenrick that shots were fired, but that Lemus's whereabouts were unknown. (SUF 66.) Wenrick understood the event to be a barricaded suspect situation. (SUF 67.) He instructed his lieutenant to request the help of Special Weapons and Tactics ("SWAT"). (SUF 68.) SWAT arrived within an hour, set up the perimeter, and announced to Lemus to come out but he did not respond. (SUF 69–72.) SWAT then sent a drone into the shop and saw Lemus lying on the ground. (SUF 75.) SWAT requested and received a warrant to enter the shop. (SUF 75.) A SWAT foot team entered the shop and found Lemus's pulseless body. (SUF 75–76.) The paramedic summoned to the scene pronounced Lemus dead and an autopsy later revealed that Lemus died from two gunshot wounds to his chest. (SUF 77–78.)

**E. AZPD Policy & Subsequent Investigation**

Policies set forth in AZPD's manual effective at the time of Lemus' shooting included reasonable use of deadly force, assessment of threats warranting force, handling barricaded suspects, medical considerations, and medical aid in investigation situations. (SUF 97.) Bird's training profiles and field training manual with AZPD

included use of force training, arrest and control tactics, using firearms, response to barricaded suspects, and rendering first aid. (SUF 98.)

AZPD Policy 306 governed all officer-involved shootings ("OIS") at the time of this shooting and required that any OIS be investigated in a thorough, fair, and impartial manner. (AMF 33.) Regardless of which agency handled the criminal investigation, AZPD retained control of the administrative and civil investigations of its own officers. (AMF 35.) The City found no administrative-investigation file, internal-affairs entry, or other record showing that AZPD opened an administrative investigation into Lemus's shooting. (AMF 42.) AZPD did not assign an internal investigator and did not complete an administrative report. (AMF 44.) The City could not identify any debrief report, policy analysis, corrective memorandum, or target-identification review related to this incident. (AMF 79.) Bird received only AZPD's standard post-OIS leave and returned to active duty approximately one month after the shooting. (AMF 47.)

Sometime in 2022, AZPD placed Bird on administrative leave. (SUF 81.) The California Department of Justice ("CDOJ") later assumed the criminal review of Bird's shooting after AZPD raised a potential conflict involving the Los Angeles County District Attorney's Office. (AMF 52.) The CDOJ found that Bird could not see his target when he fired through the closed door and did not know what was beyond the door when he fired. (AMF 53–54.) The CDOJ also identified that AZPD officers' failure to secure the shotgun during the protective sweep created a serious safety risk. (AMF 56.) After receiving the DOJ report, Wenrick, then AZPD's Chief of Police, reviewed the investigative materials and determined that Bird's shooting complied with AZPD's deadly-force policy. (AMF 58.) Wenrick then ordered Bird's return to patrol. (AMF 58.) AZPD did not require that Bird undergo any remedial training or retraining before returning him to active duty and did not impose any discipline on Bird relating to Lemus's shooting. (AMF 59–60.)

### F. This Litigation

On November 18, 2019, Plaintiffs initiated this civil rights action against Defendants. (Compl.) Plaintiffs bring eleven causes of action against Defendants under 42 U.S.C. § 1983 for (1) detention and arrest; (2) excessive force; (3) denial of medical care; (4) substantive due process; (5) municipal liability based on ratification; (6) municipal liability based on inadequate training; (7) municipal liability based on unconstitutional custom, practice, or policy; (8) false imprisonment; (9) battery; (10) negligence; and (11) violation of California's Bane Act. (Second Am. Compl. ("SAC") ¶¶ 40–126, Dkt. No. 86.) Defendants move for summary judgment on all causes of action. (Mot. 8–27.)

## III. EVIDENTIARY OBJECTIONS

Defendants raise objections to some of Plaintiffs' opposition evidence. (Defs. Obj. ISO Reply, Dkt. No. 130-1.) However, much of the material to which Defendants object is unnecessary to the resolution of the Motion and the Court need not resolve those objections. For similar reasons, relevance- and foundation-based objections are moot in the context of summary judgment motions. *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006). As for hearsay, a court may not *grant* a summary judgment motion on the basis of hearsay evidence, but it may *deny* a summary judgment motion on the basis of hearsay evidence as long as it finds that the hearsay evidence would be admissible at trial. Fed. R. Civ. P. 56(e); *Fraser v Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). Further, the Court does not consider improper opinion and legal conclusions offered in the parties' statements of fact and dispute, (Scheduling & Case Management Order 7–9, Dkt. No. 89), so any objections on those bases are also moot. Finally, the Court considers only admissible evidence in resolving this Motion. To the extent the Court cites evidence to which Plaintiffs or Defendants have objected, the objections are impliedly overruled. *See Burch*, 443 F. Supp. 2d at 1122 (proceeding with only necessary evidentiary rulings).

## IV. LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is "material" where it might affect the outcome of the suit under the governing law, and the dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden of establishing the absence of a genuine issue of material fact lies with the moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once the moving party satisfies its initial burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *See id.* at 324; *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must show that there are "genuine factual issues that . . . may reasonably be resolved in favor of either party." *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*, 477 U.S. at 250) (emphasis omitted). Courts should grant summary judgment against a party who fails to make a sufficient showing on an element essential to her case when she will ultimately bear the burden of proof at trial. *Celotex*, 477 U.S. at 322–23.

In ruling on summary judgment motions, courts "view the facts and draw reasonable inferences in the light most favorable" to the nonmoving party. *Scott*, 550 U.S. at 378 (citation modified). Conclusory, speculative, or "uncorroborated and self-serving" testimony will not raise genuine issues of fact sufficient to defeat summary judgment. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Further, though the Court may not weigh conflicting evidence or make credibility determinations, there must be more than a mere scintilla of contradictory evidence to survive summary judgment. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

The Court may assume that material facts claimed and adequately supported are undisputed except to the extent that such material facts are (a) included in the opposing party's responsive statement of disputes *and* (b) controverted by declaration or competent written evidence. C.D. Cal. L.R. 56-4. The Court is not obligated to look any further in the record for supporting evidence other than what is actually and specifically referenced. *Id.*

## V. DISCUSSION

Defendants move for summary judgment on all of Plaintiffs' causes of action. (Mot. 8–27.) In their opposition brief, Plaintiffs concede summary judgment as to their first, third, fourth, sixth, and eighth causes of action, all claims against Chivas, and punitive damages as to all Defendants except Bird. (Opp'n 2, 8, 16, 19, 26, 29, Dkt. No. 127.) As such, remaining before the Court for summary adjudication are Plaintiffs' second, fifth, seventh, ninth, tenth, and eleventh causes of action, as well as Plaintiffs' request for punitive damages as to Bird. (Reply 1, Dkt. No. 130.)

### A. Excessive Force (Count 2)

Defendants contend they are entitled to summary judgment on Plaintiffs' second cause of action for excessive force because their actions were objectively reasonable and they are entitled to qualified immunity. (Mot. 9–12, 18–20.)

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation modified). Qualified immunity requires a two-step inquiry: (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right"; and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 232. "Defendants are only entitled to qualified immunity as a matter of law if, taking the facts in the light most favorable to [the plaintiff], they violated no clearly established constitutional right." *Torres v. City of Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008).

*1. Constitutional Violation*

"An excessive force claim is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances." *County of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017). The Fourth Amendment applies an objective reasonableness standard to claims of excessive force. *Scott*, 550 U.S. at 381. The reasonableness of a use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Courts consider, among other factors, "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id.* "Of these, the 'immediate threat to safety' factor is the most important." *Peck v. Montoya*, 51 F.4th 877, 887 (9th Cir. 2022). These factors are evaluated under "the totality of the circumstances," which is "a highly fact-intensive task." *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011). "Where the objective reasonableness of an officer's conduct turns on disputed issues of material fact, it is a question of fact best resolved by a jury." *Id.* at 1123 (citation modified). As reasonableness generally "requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, . . . summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Id.* at 1125 (citation modified).

Drawing all reasonable inferences in Plaintiffs' favor, a reasonable jury could conclude that Bird's use of deadly force was objectively unreasonable. Lemus initially posed a threat to the officers when he grabbed the shotgun and struggled with Arias over it. (AMF 8–10.) However, the dispositive inquiry here is not whether Lemus posed a threat earlier, but whether he posed an *immediate* threat when Bird used deadly force. Viewing the evidence in Plaintiffs' favor, a reasonable jury could conclude he did not. Before Bird fired, Lemus and Arias's struggle over the shotgun ended, and Arias gained full control of the shotgun and held it in his hands. (SUF 48–51; AMF 11.) It is

undisputed that, after Arias and Lemus struggled over the shotgun, Bird could no longer see it. (AMF 15.) Rather, Bird only saw Lemus pass through the workshop doorway and begin closing the door. (SUF 52; AMF 16, 18.) Although Bird assumed Lemus still possessed the shotgun, he did not actually see it in Lemus's hands before firing four rounds through the closed door. (AMF 16, 19–20.) Thus, if Arias had already secured the shotgun, a jury could find that the threat justifying deadly force no longer exited and Bird "fired at an unarmed man who, although in the presence of a gun," was "moving away from it when he was shot." *Peck*, 51 F.4th at 887. "A fortiori, a jury might conclude that because [Lemus] was *not* armed—and was not about to become armed—he did not pose an immediate threat to the police or the public, so deadly force was not justified." *Id.* at 888. "A jury will have to decide what actually happened." *Id.*

Even assuming Bird's mistaken belief that Lemus still possessed the shotgun was reasonable, a jury could still find that Bird's use of deadly force was excessive. *See George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (affirming denial of summary judgment where suspect had a gun but did not point it at the officers or threaten them); *see also Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997) ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed.").

The manner in which Bird used deadly force further creates triable issues. Bird fired four rounds in rapid succession through the workshop door after Lemus entered the door and closed it behind him. (SUF 52, 54; AMF 18–19.) Bird gave no warning before shooting through the door. (SUF 21.) Nor did he see the shotgun in Lemus's hands before he fired. (AMF 15–17.) Further, Bird and Arias remained in the hallway after Lemus went inside the workshop and the officers had inspected the shop earlier and had not seen anyone else there. (SUF 30; AMF 24.) Thus, "a jury could conclude that no one was close enough to [Lemus] to be harmed by him before police could intervene." *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011).

Ultimately, this case presents competing evidence bearing on the most important factor: whether Lemus posed an immediate threat to the safety of the officers or others. Viewing the facts and evidence in Plaintiffs' favor, a reasonable jury could find that Bird's use of deadly force was not objectively reasonable and thus violated Lemus's constitutional rights. Defendants are not entitled to summary judgment on this basis.

*2. Clearly Established Right*

Defendants nevertheless argue they are entitled to summary judgment on grounds of qualified immunity because there was no clearly established law that would have put Bird on notice that his conduct was unlawful. (Mot. 19–20.)

For purposes of qualified immunity, a constitutional right is clearly established if "a reasonable officer would recognize that his or her conduct violates that right under the circumstances faced, and in light of the law that existed at that time." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1065 (9th Cir. 2006). The inquiry is whether "under the circumstances, a reasonable officer would have had fair notice that the force employed was unlawful, and whether any mistake to the contrary would have been unreasonable." *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004) (citation modified). Disputed facts material to the "clearly established" question must be viewed for the nonmoving party. *Longoria v. Pinal County*, 873 F.3d, 699, 709 (9th Cir. 2017).

A clearly established constitutional right "must be 'particularized' to the facts of the case." *Davis v. United States*, 854 F.3d 594, 599 (9th Cir. 2017). Courts look to whether there is a "case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White v. Pauly*, 580 U.S. 73, 79 (2017). This does not "require a case directly on point for a right to be clearly established," so long as "existing precedent" places "the statutory or constitutional questions beyond debate." *Kisela v. Hughes*, 584 U.S. 100, 104, (2018). Thus, existing cases do not have to have "materially similar factual circumstances or even facts closely analogous" to the current case but should make it "sufficiently clear such that any reasonable official"

would have understood they were violating the Fourth Amendment. *Reese v. County of Sacramento*, 888 F.3d 1030, 1038–39 (9th Cir. 2018) (citation modified).

Viewing the evidence and resolving inferences in Plaintiffs' favor, a reasonable jury could find that Lemus was not armed, retreated into his workshop, and closed the door behind him; Lemus was alone in the workshop; Arias and Bird remained in the hallway and could exit safely; and Bird realized Lemus was unarmed but still fired four rounds through the closed door. Thus, a reasonable jury could find that Bird's use of deadly force in these circumstances, where Lemus did not directly threaten the officers or others and had retreated inside his workshop, is unreasonable. *See, e.g.*, *A.K.H. v. City of Tustin*, 837 F.3d 1005, 1010–13 (9th Cir. 2016) (holding deadly force not justified where the officer "escalated to deadly force very quickly," and shot suspect when suspect had no gun, was walking away, and did not pose any immediate threat).

*A.K.H.* is illustrative. There, police officers encountered a suspect whom they believed might be armed because he kept one hand concealed in his pocket. *Id.* at 1009. The suspect walked away from the officers, never displayed a weapon, and did not threaten them. *Id.* Although the officers ordered the suspect to remove his hand from his pocket, one officer fired two shots in rapid succession almost immediately after issuing the command. *Id.* The Ninth Circuit held that a reasonable jury could find the officer's rapid escalation to deadly force objectively unreasonable because the suspect neither posed an immediate threat nor engaged in conduct justifying lethal force. *Id.* at 1012–13. The same reasoning applies here. Viewing evidence in Plaintiffs' favor, a jury could find that Lemus had withdrawn into his workshop, closed the door behind him, and no longer posed a threat to the officers when Bird shot through the closed door.

Even assuming Bird reasonably believed that Lemus still had the shotgun, it was clearly established before this shooting that possession of a gun does not justify deadly force absent some action indicating immediate threat. *See e.g.*, *George*, 736 F.3d at 838 (affirming denial of summary judgment where a suspect had a gun but did not point it at the officers or threaten them); *Est. of Lopez v. Gelhaus*, 871 F.3d 998, 1020 (9th Cir.

2017) (noting that *Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991) gave the defendant notice that officers could not reasonably believe the use of deadly force was lawful when a suspect "did not point the gun at the officers" and "was not facing them when they shot him"). A reasonable jury could likewise conclude that, even if Lemus still possessed the shotgun, he withdrew into his workshop and, at the time Bird fired, he took no action suggesting that he posed an imminent threat to the officers or others.

In sum, genuine disputes of material fact preclude the determination that Bird's use of deadly force was reasonable or that Defendants are entitled to qualified immunity as a matter of law. *Est. of Lopez*, 871 F.3d at 1021 ("[S]ummary judgment in favor of moving defendants is inappropriate where a genuine issue of material fact prevents a determination of qualified immunity until after trial on the merits."); *Est. of Strickland v. Nevada County*, 69 F.4th 614, 622 (9th Cir. 2023) (same). Thus, the Court **DENIES** Defendants' Motion as to Plaintiffs' second cause of action for excessive force.

**B. Municipal Liability (Counts 5 & 7)**

Defendants argue they are entitled to summary judgment on Plaintiffs' fifth and seventh causes of action for municipal liability based on two independent theories under *Monell v. Department of Social Services*, 436 U.S. 658 (1978): (1) ratification, and (2) unconstitutional policy, practice, or custom. (Mot. 22–24, 26; Reply 9–13.)

As a general matter, municipal liability is not available in § 1983 actions under a respondeat superior theory, but municipalities can be held liable in certain situations. *Monell*, 436 U.S. at 691. A local government may be held liable when the execution of a governmental policy or custom inflicts the constitutional injury. *Id.* at 694. A plaintiff may prove municipal liability if she can show that (1) a city employee committed a constitutional violation pursuant to an official municipal policy or a longstanding practice or custom; (2) the city employee who committed the violation had final policymaking authority; or (3) an official with final policymaking authority ratified a subordinate's unconstitutional action. *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992) (citation modified).

*1. Ratification (Count 5)*

A local government may be held liable under § 1983 when "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Id.* at 1346–47. "There must, however, be evidence of a conscious, affirmative choice" by the authorized final policymaker. *Id.* at 1347. To show *Monell* liability under a ratification theory, the final policymaker must make a deliberate choice to follow a certain course of action from among various alternatives. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986). The final policymaker must have approved not only the subordinate's decision but also the basis for it. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."). Thus, ratification requires "knowledge of the alleged constitutional violation." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999). "Ordinarily, ratification is a question for the jury." *Id.* at 1238–39.

Plaintiffs contend that Wenrick, AZPD's Chief of Police, was the City's final policymaker and affirmatively ratified Bird's unconstitutional actions by determining that Bird's conduct complied with AZPD policy and by failing to discipline Bird. (SAC ¶ 67–75; Opp'n 24–26.) Thus, Plaintiffs rely exclusively on Wenrick's post-incident actions he took as AZPD's Chief of Police. While it is undisputed that, at the time of this incident, AZPD's Chief of Police had final authority to establish AZPD policies and approve or reject use of force and OIS policies, (AMF 39), it is also undisputed that Wenrick was not AZPD's Chief of Police at the time of Lemus's shooting, (AMF 41). Plaintiffs thus identify no evidence that Wenrick possessed final policymaking authority over the challenged use of force decision at the time Bird made that decision. That Wenrick became Chief of Police sometime after this incident does not alter this conclusion because ratification requires that a final policymaker make a deliberate choice regarding the challenged conduct and the basis for it, not merely retrospectively review and approve a conduct after the fact. *Gillette*, 979 F.2d at 1347–48.

Nor does Wenrick's post-incident conduct create a triable issue. The Ninth Circuit has explained that a policymaker's after-the-fact approval of an officer's conduct or failure to discipline ordinarily is insufficient to show ratification. *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1253–54 (9th Cir. 2010), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). Plaintiffs offer evidence that, although Wenrick had the power to impose discipline on police officers, he did not do so in response to Bird's actions. (AMF 40, 49.) "This bare allegation is insufficient to create a triable issue of fact." *Clouthier*, 591 F.3d at 1253. Plaintiffs "have not adduced evidence that [Wenrick] was a final policymaker or, even if he were, that he made a conscious, affirmative choice to approve [Bird's] actions and adopt them as official policy." *Id.* "The fact that a particular official . . . has discretion in the exercise of particular functions does not, without more, give rise to municipal liability" unless the official is also "responsible for establishing final governmental policy respecting such activity." *Pembaur*, 475 U.S. at 481–82. Indeed, "[t]o hold cities liable under [§] 1983 whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle *respondeat superior* liability into [§] 1983 law [creating an] end run around *Monell*." *Gillette*, 979 F.2d at 1348.

As Plaintiffs have failed to produce evidence from which a reasonable jury could conclude that a final policymaker made a conscious, affirmative decision to approve both Bird's alleged unconstitutional conduct and the basis for that conduct, Defendants are entitled to summary judgment. Thus, the Court **GRANTS** Defendants' Motion as to Plaintiffs' fifth cause of action for municipal liability based on ratification.

*2. Unconstitutional Policy, Practice, or Custom (Count 7)*

Municipal liability attaches when the execution of a governmental policy or custom inflicts the constitutional injury. *Monell*, 436 U.S. at 694. A municipality may be held liable if a plaintiff can show that "(1) he was deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to [plaintiff's] constitutional right; and (4) the policy was the moving force behind the

constitutional violation." *Lockett v. County of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020). "Liability for an improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 405 (1997).

Plaintiffs contend that the AZPD maintained a longstanding custom of bypassing administrative OIS investigations. (SAC ¶ 90; Opp'n 26–27.) According to Plaintiffs, by failing to conduct those investigations, AZPD removed its "mechanism for detecting, correcting and deterring unsafe deadly-force decisions," thus allowing OIS conduct "so long as outside agencies declined criminal charges" and creating an "environment in which Bird fired without identifying the weapon, target or backdrop." (Opp'n 27.)

As an initial matter, Plaintiffs assert that AZPD policy required a separate internal administrative investigation following every OIS and AZPD failed to perform one after Lemus's shooting and after other OIS incidents at least five years before this shooting. (Opp'n 26–27.) However, Defendants present evidence that, before 2019, AZPD did not require an immediate internal-affairs investigation following every OIS and instead relied on the homicide investigation interviews. (Resp. AMF 64–70.) According to Defendants' evidence, only after 2019 (and well after this shooting) did AZPD separate internal-affairs investigations become mandatory. (Resp. AMF 64–70.) Plaintiffs identify no policy language or evidence establishing that, at the time of Lemus's shooting, AZPD policy required the separate internal administrative investigation Plaintiffs describe. Thus, even viewing the evidence in Plaintiffs' favor, the record does not contain evidence from which a reasonable jury could conclude that AZPD's alleged practice deviated from the policies governing OIS during the relevant period.

Plaintiffs' claim also fails for an independent reason. Specifically, Plaintiffs fail to produce evidence from which a reasonable jury could conclude that the alleged practice was the moving force behind Bird's use of deadly force against Lemus. To impose municipal liability based on an unconstitutional custom, "[t]he plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged," meaning that the plaintiff "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404. Plaintiffs acknowledge that "[m]unicipal liability requires a direct causal link between the custom and the constitutional injury." (Opp'n 28.) However, they fail to offer any evidence that AZPD's alleged practice caused this shooting.

To support their causation theory, Plaintiffs identify six prior firearm-related OIS incidents during the five years preceding Lemus's shooting in which, like here, AZPD did not conduct internal investigations and imposed no discipline, remedial training, or OIS-related policy changes. (AMF 63, 71.) But this evidence does not establish that the alleged practice caused Bird's conduct here. Plaintiffs identify no evidence from which the jury could conclude that Bird knew AZPD allegedly forewent administrative investigations after an OIS; that Bird expected any unconstitutional use of force would escape review because of AZPD's practice; or that AZPD's post-incident investigative procedures influenced Bird's decision. Instead, Plaintiffs ask the jury to infer that years of allegedly inadequate post-incident review fostered a generalized culture of immunity, that Bird internalized that culture, and that it influenced his decision to use deadly force. Such an attenuated chain of inferences cannot satisfy *Monell*'s causation requirement. Resolving all evidentiary inferences in Plaintiffs' favor, "they have at most shown that [AZPD] could have better implemented its policies. But as the Supreme Court has indicated, '[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident.'" *Clouthier*, 591 F.3d at 1253 (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)).

As Plaintiffs have failed to produce evidence from which a reasonable jury could conclude the City maintained a longstanding custom and that custom was the moving force behind the constitutional violation, Defendants are entitled to summary judgment. Thus, the Court **GRANTS** Defendants' Motion as to Plaintiffs' seventh cause of action for municipal liability based on an unconstitutional custom or practice.

### C. Battery and Negligence (Counts 9 & 10)

To prove battery under California law, a plaintiff must show that "(1) defendant touched plaintiff, or caused plaintiff to be touched, with the intent to harm or offend plaintiff; (2) plaintiff did not consent to the touching; (3) plaintiff was harmed or offended by defendant's conduct; and (4) a reasonable person in plaintiff's position would have been offended by the touching." *So v. Shin*, 212 Cal. App. 4th 652, 668–69 (2013). To prove negligence under California law, "a plaintiff must show that defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Nally v. Grace Cmty. Church*, 47 Cal. 3d 278, 292 (1988). "[P]eace officers have a duty to act reasonably when using deadly force." *Hayes v. County of San Diego*, 57 Cal. 4th 622, 629 (2013).

Defendants argue Plaintiffs' causes of action for battery and negligence fail because Defendants' conduct was objectively reasonable. (Mot. 20–21.) However, as discussed above, a reasonable jury could find that Defendants acted unreasonably when they used deadly force. Defendants also argue they benefit from statutory immunity pursuant to California Government Code section 820.2. (*Id.* at 21.) This provision immunizes public officials from liability "resulting from [an] act or omission where the act or omission was the result of the exercise of discretion vested in [the official]." Cal. Gov't Code § 820.2. "But it has long been established that this provision does not apply to officers who use unreasonable force" in effectuating a seizure. *Blankenhorn v. City of Orange*, 485 F.3d 463, 487 (9th Cir. 2007). Thus, the Court **DENIES** Defendants' Motion as to Plaintiffs' ninth and tenth causes of action for battery and negligence.

**D. Bane Act Violation (Count 11)**

"The Bane Act civilly protects individuals from conduct aimed at interfering with rights that are secured by federal or state law, where the interference is carried out by threats, intimidation, or coercion." *Reese*, 888 F.3d at 1040 (citation modified). Bane Act claims require a plaintiff to "demonstrate both that a constitutional violation occurred (either accompanied by threat, intimidation, or coercion, or with one of those as an inherent aspect of the violation) and that the defendant had the specific intent to violate the plaintiff's constitutional right(s)." *A.B. v. City of Santa Ana*, No. 8:18-cv-01553-DOC (ADSx), 2020 WL 1937879, at *5 (C.D. Cal. Jan. 7, 2020) (citing *Reese*, 888 F.3d at 1043); *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 67 (2015). "[A] reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights." *Reese*, 888 F.3d at 1045.

Defendants argue that Plaintiffs' cause of action based on a violation of the Bane Act fails because any alleged constitutional violation was not caused by "threats, intimidation or coercion" and they did not act with the specific intent to violate Lemus's rights. (Mot. 22.) However, a reasonable jury viewing the evidence in Plaintiffs' favor could find that Defendants recklessly disregarded Lemus's constitutional right to be free from excessive force, which is sufficient to meet the specific intent requirement under the Bane Act. *Reese*, 888 F.3d at 1045. Thus, the Court **DENIES** Defendants' Motion as to Plaintiffs' eleventh cause of action for violation of the Bane Act.

**E. Punitive Damages (against Bird only)**

Punitive damages are available against individual officers under § 1983, to be awarded in the jury's discretion. *Smith v. Wade*, 461 U.S. 30, 56 (1983). The jury must find either that the defendant acted with "evil motive or intent" or "reckless or callous indifference to the federally protected rights of others." *Id.* The Ninth Circuit has also explained that "[t]he standard for punitive damages under § 1983 mirrors the standard for punitive damages under common law tort cases," which extends to "oppressive acts or omissions." *Dang v. Cross*, 422 F.3d 800, 809 (9th Cir. 2005).

As an initial matter, the Court finds that Defendants' Motion is "premature at this juncture, as the punitive damages issue is better decided after a liability determination." *Khan v. City of Los Angeles*, 753 F. Supp. 3d 997, 1019 (C.D. Cal. 2024). Moreover, as discussed above, a reasonable jury viewing the evidence in Plaintiffs' favor could find that, in shooting through the closed door at Lemus when he was unarmed and posed no immediate threat to the officers or others, Bird acted with reckless or callous indifference to Lemus's constitutional right to be free from excessive force. The Court "is not inclined to take the question of punitive damages out of the factfinder's hands where there are still viable claims for, among other things, . . . excessive force." *Johnson v. County of San Bernardino*, No. 5:18-2523-GW (AFMx), 2020 WL 5224350, at *30 (C.D. Cal. June 24, 2020). Thus, the Court **DENIES** Defendants' Motion as to Plaintiffs' request for punitive damages against Bird.

## VI. CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment. (Dkt. No. 122.) Specifically, the Court **GRANTS** summary judgment in Defendants' favor on Plaintiffs' fifth and seventh causes of action. In light of Plaintiffs conceding summary judgment as to their first, third, fourth, sixth, and eighth causes of action, all claims against Chivas, and punitive damages as to all Defendants except Bird, the Court also **GRANTS** summary judgment in Defendants' favor as to those causes of action and claims. The Court **DENIES** Defendants' Motion in all other respects.

**IT IS SO ORDERED.**

August 10, 2026

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**